***E-FILED - 10/13/09***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERTO URIETA, | No. C 07-3935 RMW (PR) |
| Petitioner, | ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS |
| vs. | |
| BEN CURRY, Warden, | |
| Respondent. | |

On July 31, 2007, petitioner Roberto Urieta filed a petition for a writ of habeas corpus pursuant to title 28 U.S.C. section 2254, challenging as a violation of his constitutional rights the denial of parole by the California Board of Parole Hearings ("Board") on September 29, 2005. On February 25, 2008, the court issued an order to show cause why the writ should not be granted. On April 21, 2008, respondent filed an answer. On May 20, 2008, petitioner filed a traverse. Having considered all of the papers filed by the parties, the petition is GRANTED.

## BACKGROUND

**I.   The Commitment Offense**

The following summary of the facts of petitioner's commitment offense is derived from the evaluation report prepared for the 2005 hearing and the hearing transcript. (*See generally* Resp. Exs. 2 and 4.)

<u>The Official Version</u>.  On June 5, 1986, petitioner and his friend Caceras drove to 2801 West Pico Boulevard and petitioner shot Jose Alvir with a .25 caliber handgun. Alvir died at the scene.

<u>Petitioner's Version</u>.  At the time of the crime, petitioner was nineteen-years-old and staying at home from his job as a cutter and sewing machine operator because of a broken leg.  Petitioner's friends Pitufo, Caceras and Ceasar asked him to go with them to buy marijuana.  They drove to a place where there was a fight going on.  They stopped and got out of the car to observe the fight.  Alvir, who was also nineteen years old at the time and one of the participants in the fight, came up to them and told them to leave. Alvir and petitioner began arguing and Alvir attacked petitioner with a hammer. Petitioner, Caceras and Ceasar got into the car, and Alvir smashed the car's window. Petitioner and his friends drove away, leaving Pitufo behind.  They went to petitioner's mother's house.  Petitioner went in to use the bathroom.[1]  Then he and his friends went back to find Pitufo because they were concerned for Pitufo's safety.  When they arrived back at the scene of the fight, a group of people including Alvir, came towards the car. Petitioner pulled out the gun and fired it to frighten them.  Petitioner and his friends then drove away.  According to petitioner, he did not realize that anyone had been killed during the incident until the police arrested him the following day.  When they came back to their neighborhood, petitioner and his friends saw Pitufo, who was beat up and robbed by Alvir and his friends.

Claims were made that the shooting was gang-related because Caceras, Pitufo, Ceasar and Alvir belonged to different gangs.  Petitioner contends that he never belonged to a gang but was affiliated with one because of the neighborhood he lived in.  He also contends that gang affiliation did not play a role in this offense.

---

[1] Petitioner initially told the police that he went back to his mother's house to get the gun.  However, he now contends that he had the gun at the time of the earlier argument with Alvir.  He always carried the gun on him because he lived in a dangerous neighborhood and was afraid of being robbed.

## II. Plea, Sentencing, and Parole Hearings

Petitioner plead guilty to second degree murder with the use of the firearm. (Pet. at 2; Resp. Ex. 1.) On July 8, 1987, the superior court sentenced petitioner to fifteen years to life in prison with the possibility of parole. (Resp. Ex. 1.) The enhancement for use of the firearm was stayed. *Id*. Petitioner is currently incarcerated at the Correctional Training Facility ("CTF") at Soledad. (Resp. Ex. 2 at 1.)

Petitioner's minimum eligibility parole date was May 27, 1996. (*Id.*) At five hearings between 1995 and 2003, the Board found petitioner unsuitable for parole. On September 29, 2004, at his sixth hearing, the Board found petitioner suitable for parole. On February 25, 2005, Governor Arnold Schwarzenegger reversed the Board's grant of parole.[2] (Resp. Ex. 4 at 3.) On September 29, 2005, at petitioner's seventh hearing, the Board found petitioner unsuitable for parole. (Resp. Ex. 2.) Petitioner challenges the Board's September 29, 2005 decision in the instant petition.

## III. September 29, 2005 Board Hearing

At the time of his September 29, 2005 parole suitability hearing, petitioner had been incarcerated for more than nineteen years. He was represented by counsel at the hearing. (Resp. Ex. 2 at 2.) During his incarceration, petitioner maintained an exemplary record. He received no CDC-115 violations during the period of his incarceration, and only three CDC-128-C violations, the last one 11 years before the hearing. (Resp. Ex. 4 at 3; Ex. 2 at 46, 81; Pet., Ex. F at 5-6.)

Petitioner presented the Board with an extensive record of his positive prison performance and rehabilitation. At the time of the hearing, petitioner was working as a computer refurbishing technician receiving satisfactory grades. (Resp. Ex. 4 at 2.) He received a laudatory chrono for participating in a special project consisting of upgrading computers. (Resp. Ex. 4 at 3.) Previously, he worked as a teacher's aid for

---

[2] Petitioner has challenged the Governor's decision in a habeas corpus petition also pending before this court. *See Urieta v. Curry*, No. 07-0137 RMW (PR) (2007).

Order Granting Petition for Writ of Habeas Corpus
P:\pro-se\sj.rmw\hc.07\Urieta935habeas.wpd         3

approximately three and a half years at the North Facility of CTF. (Pet., Ex. F at 3.) During his incarceration, petitioner completed two vocational courses: vocational welding in 1999 and auto tune-up in 1985. (Resp. Ex. 2 at 47, 81.) He also completed a substantial amount of hours to obtain a certificate of electronic technician, although he was unable to finish the course through no fault of his own. (*Id.*)

Petitioner had availed himself of many self-help, self-improvement, and therapy programs in prison. He received his high school diploma and GED, and completed thirty units of college credits.[3] (*Id.* at 47; Resp. Ex. 3 at 3.) Petitioner has remained alcohol and drug free since his incarceration and participated in Alcoholics Anonymous (AA) and Narcotics Anonymous (NA), for which he received a laudatory chrono. (Resp. Ex. 2 at 47-48; Resp. Ex. 4 at 2.) Petitioner was one of the founding members of AA at CTF, and at one point served as vice president of the group. (Resp. Ex. 2 at 47-48.) He also established a Spanish-speaking AA group. (*Id.*) Petitioner completed the Life Skills Program with Dr. Bakeman, as well as individual therapy with Dr. Terrini. (Pet., Ex. F at 4; Resp. Ex. 3 at 2.)

The Board considered a 2003 report by Dr. Hewchuk, a staff psychologist. Upon assessing petitioner's commitment offense, prior record, vocational and educational courses completed in prison, and prison adjustment, the psychologist found that petitioner's potential for violence within the controlled setting was "minimal relative to the total inmate population." (Resp. Ex. 2 at 48-49, 80-81.) He also found that, if petitioner were to be released into the community, his violence potential would be "no greater than that of an average citizen in the community." (*Id.* at 49, 81.) Dr. Hewchuk noted that petitioner "is highly career motivated, and can be expected to adapt quickly and successfully in the community environment." (*Id.* at 49.) Finally, Dr. Hewchuk found that petitioner "takes responsibility for his action, and is generally remorseful" and

---

[3] Petitioner left school when he was 15 years old having completed the 10th grade. (Resp. Ex. 4 at 2.)

Order Granting Petition for Writ of Habeas Corpus
P:\pro-se\sj.rmw\hc.07\Urieta935habeas.wpd          4

1  that he "recognizes that early environment factors as the gang affiliation" negatively
2  affected his life. (*Id*. at 48.)

3       Dr. Hewchuk's findings were consistent with earlier psychological reports. For
4  example, in the 1999 report, Dr. Reed stated that petitioner's "current level of insight and
5  judgment in general and specifically regarding his commitment offense are [sic] excellent
6  and substantially supports a positive prediction of successful adaptation to community
7  living." (Pet., Ex. F at 4.) Likewise, in the 1997 report, Dr. Bakeman found that
8  petitioner's "insight and judgment also appear to be better now than when he was 18,"
9  and "[i]f released, I expect him to be able to maintain the gains that he has made." (Pet.,
10 Ex. F at 8.)

11      The Board asked many questions about the crime and petitioner's gang affiliation
12 at the time of the crime. (*See*, *e.g.*, *id.* at 25-26, 35-36, 52-53.) The Board commended
13 petitioner for his candid and truthful answers to the Board's questions: "I thought you
14 were very candid, and you told the truth when there were some difficult questions, so we
15 appreciate that." (*Id.* at 82.) The Board inquired how petitioner felt about his crime and
16 whether petitioner ever tried to find out about victim's family. (*Id.*) Petitioner stated that
17 he felt "real sorry" for the crime he committed. (*Id*. at 34.) Petitioner expressed remorse
18 for putting the victim's family through the same thing that his family went through when
19 petitioner's father was shot and killed at the time petitioner was one year old. (*Id*. at 28-
20 29.) Petitioner stated that he tried to learn about victim's family through his mother, her
21 church, and some other relatives. Petitioner learned that the only relative the victim had
22 in the United States was his father who immigrated from El Salvador. After the victim
23 was killed, the church, with the help of petitioner's mother, raised money to send the
24 victim to be buried in El Salvador. Victim's father went back to El Salvador for burial,
25 and to petitioner's knowledge, he did not return to the United States. Petitioner was
26 unable to locate the contact information for the father or any other victim's relatives in El
27 Salvador. (*Id.*)

28      The Board considered petitioner's stable relationships with his family, in

Order Granting Petition for Writ of Habeas Corpus
P:\pro-se\sj.rmw\hc.07\Urieta935habeas.wpd     5

particular, his mother, his twenty-two-year-old daughter and his three-year-old grandson. (*Id*. at 42.)  The Board also considered petitioner's tremendous amount of support from the other family members and friends, noting that a petition with 28 new signatures was submitted on petitioner's behalf by his family in Mexico.  (*Id*. at 38.)  In addition, there were individual letters of support from petitioner's sister, cousin, mother, pastor and friends.  (*Id.* at 37-40.)  Because petitioner is a Mexican citizen and subject to an active USINS hold, he made parole plans both in Mexico and in Los Angeles County, his county of last residence.  (Resp. Ex. 4 at 2.)  Peitioner's cousin offered petitioner employment at Yamasa Enterprise, a sowing factory, in Los Angeles.  (Resp. Ex. 2 at 39.)  Petitioner's mother purchased a retail business in Mexico, and wanted petitioner to live with her and take over in managing the store.  (*Id*. at 38, 40.)  A legislator from Mexico offered petitioner support and another job.  Pastor Alvaro Sanchez from El Monte, California wrote:  "[T]he doors of this congregation continue be open for Mr. Roberto Urieta . . . . He is welcome to be part of our membership."  (Pet., Ex. C; *see also* Resp. Ex. 2 at 39.) Petitioner indicated that if he was required to stay in Los Angeles, his county of residence, he would reside with his sister.  Otherwise, he would go to Mexico, reside with his mother and help her in the family business.  (Resp. Ex. 2 at 41-43.)  The Board found that petitioner "does have realistic parole plans in the County of residence, as well as in Mexico, and he does have acceptable employment plans, and he does have marketable skills, such as welding and auto tune-up."  (*Id*. at 81.)

       The Board considered the fact that petitioner was granted parole at the last Board hearing, and even though the Governor reversed the Board's decision, petitioner continued to remain disciplinary free, continued with his vocational courses and AA involvement and his other accomplishments in prison.  (*Id*. at 24-25, 82.)

       The Board reviewed petitioner's prior criminal history.  Petitioner had one felony and one misdemeanor as a juvenile, and one misdemeanor as an adult.  At age 16, petitioner was arrested for driving a vehicle without the owner's consent and receiving stolen property.  Petitioner was placed on probation.  (Resp. Ex. 4 at 2.)  At the hearing,

1  petitioner explained that his friend asked him to pick up some girls from some place and
2  bring them to the friend's party.  The friend gave him keys to a car and said he should use
3  that car.  When petitioner was stopped by the police, it turned out that the car was stolen.
4  Petitioner accepted responsibility for this violation because he believed he should have
5  questioned his friend about the ownership of the car.  (Resp. Ex. 2 at 30.)  Several months
6  later, petitioner was arrested for battery.  Petitioner and his friends had an altercation with
7  their high school teacher, during which petitioner pushed the teacher.  (Pet., Ex. B at 12.)
8  Petitioner was placed on probation.  (Resp. Ex. 4 at 2; Resp. Ex. 2 at 33.)  At the hearing,
9  petitioner claimed that the court threw out that case against him because petitioner never
10 pushed the teacher.  (Resp. Ex. 2 at 33.)  At the age of 17, petitioner was arrested for
11 throwing a rock at a police officer.  Petitioner served eight days in jail and was put on
12 probation.  (Resp. Ex. 4 at 2; Resp. Ex. 2 at 32.)  At the hearing, petitioner claimed that he
13 did not throw the rock.  (Resp. Ex. 2 at 32; *see also* Pet., Ex. B at 11-12.)

14         Finally, the Board considered the opposition to petitioner's parole.  Los Angeles
15 County deputy district attorney Lawrence Morrison attended the hearing and voiced the
16 office's opposition to petitioner's parole based on the "crime, the danger it presented [to
17 other people around the victim,] the differing stories given by the inmate."  (Resp. Ex. 2
18 at 72.)  Morrison stated that "people like the inmate, his gang, and the rival gangs are like
19 rats through out [sic] Los Angeles endangering citizens and gunning down people,
20 innocent people, everyday."  (*Id*.)  He expressed skepticism over petitioner's "sense of
21 contrition and remorse."  (*Id*.)

22         The Board concluded that petitioner was not suitable for parole and would pose an
23 unreasonable risk of danger to society and a threat to public safety if released.  (*Id*. at 79.)
24 Although the Board commended Petitioner for actively participating in self-help, staying
25 discipline-free and achieving marketable vocational skills, it found that his gains did not
26 outweigh the factors of unsuitability.  (*Id*. at 81.)  The Board stated that its primary reason
27 for denying parole was that the offense was carried out in "an especially cruel and callous
28 manner" and demonstrated "an exceptionally callous disregard for human suffering in that

at the time the crime was committed it was a public area, it was an open area, and other individuals could have been injured or killed." (*Id*. at 79.) The Board reasoned that the motive was very trivial in relation to the offense, and there seemed to be some gang retaliation involved in the crime. (*Id*. at 79-80.) The Board also found that petitioner's pre-incarceration history indicated an escalating pattern of criminal conduct. (*Id*. at 80.) The Board characterized petitioner's exemplary conduct in prison over nineteen-year-period and four favorable psychological reports over eight-year-period as merely "recent gains." (*Id*. at 81.)

**IV.     State Court Petition for Writ of Habeas Corpus**

Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court challenging the Board's decision. The petition was summarily denied. (Resp. Ex. 6.) Subsequently, petitioner brought a habeas corpus petition in this court challenging the state court's decision upholding the Board's determination.

**DISCUSSION**

**I.     Standard of Review**

Because this case involves a federal habeas corpus challenge to a state parole eligibility decision, the applicable standard is contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *McQuillion v. Duncan*, 306 F.3d 895, 901 (9th Cir. 2002). Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

The standard of review under AEDPA is somewhat different where, as here, the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. When confronted with such a decision, a federal court should conduct "an independent review of the record" to

Order Granting Petition for Writ of Habeas Corpus
P:\pro-se\sj.rmw\hc.07\Urieta935habeas.wpd         8

determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Richter v. Hickman*, 521 F.3d 1222, 1229 (9th Cir. 2008).

**II.     Analysis**

Petitioner argues that: (1) he was denied due process because the Board's decision was not supported by some evidence that he is presently dangerous; (2) the state court failed to apply contract law in interpreting his plea agreement; (3) the Board breached his plea agreement by denying him parole; and (4) the California Supreme Court's interpretation of California Penal Code § 3041(a) and related regulations violated petitioner's right to due process and the Ex Post Facto Clause of the United States Constitution. The court will first address the due process claim.

### *A.     "Some Evidence" Standard*

The United States Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to his constitutionally protected liberty interest in a parole release date if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006) (citing *Superintendent v. Hill*, 472 U.S. 445, 457 (1985)). The standard of "some evidence" is met if there was some evidence from which the conclusion of the administrative tribunal could be deduced. *Hill*, 472 U.S. at 455. An examination of the entire record is not required nor is an independent weighing of the evidence. *Id.* The relevant question is whether there is any evidence in the record that could support the conclusion reached by the administrative board. *Id.*

Respondent argues that under AEDPA, the "some evidence" standard of *Hill* does not apply to parole suitability hearings because the United States Supreme Court has not applied it in that context. Respondent further claims that the due process protections to which California prisoners are entitled by clearly established Supreme Court authority are limited to an opportunity to be heard and a statement of reasons for denial. (Resp. Answer at 8-9.) That argument, however, has been foreclosed by the controlling Ninth

Circuit authority. *See Sass*, 461 F.3d at 1128-29; *Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007). The "some evidence" standard identified is thus clearly established federal law in the parole context for purposes of § 2254(d). *Sass*, 461 F.3d at 1128-1129.

When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. *Id.* at 1128. Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record to determine whether the state court decision constituted an unreasonable application of the "some evidence" principle. *Id.*

### B.     *State Law Standard for Parole in California*

California law provides that prisoners serving an indeterminate life sentence, like petitioner, become eligible for a parole date after serving minimum terms of confinement required by statute. *See In re Dannenberg*, 34 Cal.4th 1061 (2005). At that point, a parole date should be set unless it is determined "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ." Cal. Penal Code § 3041(b). The California Code of Regulations sets out the factors showing suitability or unsuitability for parole that the Board is required to consider. *See* 15 Cal. Code Regs. tit. 15 § 2402(b). These include "[a]ll relevant, reliable information available," such as

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

*Id.*

Circumstances tending to show unsuitability for parole include the nature of the

commitment offense and whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." *Id*. § 2402(c). This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." *Id*. Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. *Id*.

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. *Id*. § 2402(d).

### C. *The State Court's Application of "Some Evidence" Standard*

The California Supreme Court upheld the denial of petitioner's parole in a summary fashion without any explanation for its decision. Accordingly, this court must conduct "an independent review of the record" to determine whether that decision was an objectively unreasonable application of clearly established federal law. *See Richter*, 521 F.3d at 1229. Respondent argues that the Board's decision to deny parole is supported by some evidence in the record, namely the gravity of the commitment offense and petitioner's criminal history as a juvenile and an adult. (Resp. Answer at 10.) The court finds that the facts relating to petitioner's commitment offense and his pre-incarceration criminal record do not satisfy the "some evidence" standard, nineteen years after he committed the offense.

The Ninth Circuit has recently addressed the effect of continued denial of parole based solely on unchanging factors such as the inmate's commitment offense and conduct prior to imprisonment. *See Biggs v. Terhune*, 334 F.3d 910, 917 (9th Cir. 2003); *Irons*, 505 F.3d at 850. In *Biggs*, the court explained that the value of the criminal offense as a predictor of parole suitability fades over time: "A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." 334 F.3d at 917. In *Irons*, the court stated that "indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." 505 F.3d at 854 (citation and footnote omitted).[4]

The California Supreme Court also recently addressed the issue of parole denial based solely on unchanging factors. In *In re Lawrence*, the court held that the assumption that "a particularly egregious commitment offense always will provide the requisite modicum of evidence supporting the Board's or the Governor's decision [was] inconsistent with the statutory mandate that the Board and the Governor consider all relevant statutory factors when evaluating an inmate's suitability for parole, and inconsistent with the inmate's due process liberty interest in parole." *In re Lawrence*, 44 Cal.4th 1181, 1191 (2008). The Board found Lawrence suitable for parole for the fourth time, after she had been in custody for twenty-four years on her life sentence for first degree murder, and the Governor for the fourth time relied upon the circumstances of the

---

[4] Although in *Biggs* and *Irons*, the court affirmed the Board's denials of parole, those cases concerned the prisoners which were deemed unsuitable for parole prior to the expiration of their minimum terms. *See Irons*, 505 F.3d at 853-54 ("all we held in [*Biggs*] and all we hold today . . . is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms"). Unlike *Biggs* and *Irons*, at the time of the Board's decision at issue here, petitioner had served more than four years after the expiration of his minimum fifteen-year sentence.

Order Granting Petition for Writ of Habeas Corpus
P:\pro-se\sj.rmw\hc.07\Urieta935habeas.wpd          12

offense to justify his reversal of the Board's decision. *Id.* at 1197-1201. Lawrence filed a state habeas petition in the California Court of Appeal and challenged the Governor's decision on several grounds. *Id.* at 1201. The appellate court in a split decision issued a writ vacating the Governor's reversal and reinstating the Board's latest finding of parole suitability. *Id.* The California Supreme Court affirmed, holding that the record failed to support the Governor's conclusion that Lawrence remained a current danger to public safety. The court further held that the commitment offense alone did not constitute "some evidence" that the prisoner posed a threat to public safety:

> In some cases, such as this one, in which evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide "some evidence" inevitably supporting the ultimate decision that the inmate remains a threat to public safety.

*Id.* at 1191. The court found a due process violation and concluded that:

> although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

*Id.* at 1214 (emphasis omitted).

In contrast, in the companion case of *In re Shaputis*, the California Supreme Court did not find a due process violation, but rather found "some evidence" of "current dangerousness," stating:

> By statute, it is established that the gravity of the commitment offense and petitioner's current attitude toward the crime constitute factors indicating unsuitability for parole, and because in this case these factors provide evidence of the risk currently posed by petitioner to the community, they provide "some evidence" that petitioner constitutes a current threat to public safety.

*In re Shaputis*, 44 Cal.4th 1241, 1246 (2008) (citations omitted). Following several

unfavorable parole hearings and after rulings by the Superior Court as well as the Court of Appeal, the Board found Shaputis suitable for parole after he had been in custody for more than eighteen years on his seventeen-years-to-life sentence for the second degree murder of his wife. *Id*. at 1245, 1252-53. The Governor reversed the Board's decision, concluding that Shaputis constituted a threat to public safety and, specifically, that the gravity of the offense as well as his lack of insight and failure to accept responsibility outweighed the factors favoring suitability for parole. *Id*. at 1253. In a split decision, the Court of Appeal issued a writ vacating the Governor's reversal. *Id*. at 1253-54. The California Supreme Court concluded that the appellate court erred in setting aside the Governor's decision because "the Court of Appeal majority improperly substituted its own parole suitability determination for that of the Governor." *Id*. at 1255. The California Supreme Court held that Shaputis' claim that the shooting was an "accident," considered with "evidence of [his] history of domestic abuse and recent psychological reports reflecting that his character remains unchanged and that he is unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative 'programming,'" all provided "some evidence" in support of the Governor's conclusion that Shaputis remained dangerous and was unsuitable for parole. *Id*. at 1260.

  The court finds that this case is analogous to *In re Lawrence*, and it is just the sort of case the Ninth Circuit envisioned in *Biggs* and *Irons*: where the commitment offense and minor criminal record prior to the offense are relied on to deny parole after service of considerably more than the minimum term, notwithstanding the prisoner's exemplary behavior and evidence of rehabilitation since the commitment offense. Furthermore, this court finds that there is no evidence in the record that supports a determination that petitioner's release would unreasonably endanger public safety. Accordingly, the California Supreme Court unreasonably applied the some evidence standard when it affirmed the Board's denial of parole to petitioner.

  The record contains substantial evidence to support the finding of parole suitability under the factors contained in the California Code of Regulations. At the time of the

1  hearing, petitioner had already served more than four years after the expiration of his
2  minimum fifteen-year sentence, and there is substantial evidence that he is rehabilitated.
3  For example, he has completed his GED and high school diploma and has taken numerous
4  college courses.  He has been certified in two vocational education subjects, and
5  completed a substantial amount of hours toward the third certification.  He has participated
6  in numerous self-help and therapy programs.  He has served in leadership roles in AA.  He
7  has maintained solid relationships with his family and made realistic plans for release both
8  in the former county of residence (Los Angeles County) or in Mexico (where petitioner
9  may be deported).  He has a stable social history, evidenced by eight years of favorable
10 psychological reports.   He responded to Board's questions truthfully and candidly.
11 Petitioner has accepted responsibility for his crime and does not seek to minimize its
12 impact.  He went to some lengths to learn about the victim and make amends with victim's
13 family.  Notably, petitioner was found to be suitable for parole in 2004.  There is nothing
14 in the record that explains why the Board rescinded this determination in 2005 or why
15 petitioner was not considered even more suitable for parole a year later.

16         The main basis for the Board's decision to deny parole is based on the gravity of
17 petitioner's commitment offense, as the Board found that the offense was committed in
18 "an especially cruel and callous manner" and demonstrated "an exceptionally callous
19 disregard for human suffering in that at the time the crime was committed it was a public
20 area, it was an open area, and other individuals could have been injured or killed." (Resp.
21 Ex. 2 at 79.)  The Board also reasoned that the motive for the crime was very trivial in
22 relation to the offense.  (*Id*. at 79-80.)

23         Second degree murder by its nature evinces a certain level of callousness because it
24 "requires express or implied malice -- *i.e.*, the perpetrator must kill another person with the
25 specific intent to do so; or he or she must cause another person's death by intentionally
26 performing an act, knowing it is dangerous to life and with conscious disregard for life."
27 *In re Smith,* 114 Cal.App.4th 343, 366 (2003).  "For this reason, it can reasonably be said
28 that *all* second degree murders by definition involve some callousness -- *i.e.*, lack of

Order Granting Petition for Writ of Habeas Corpus
P:\pro-se\sj.rmw\hc.07\Urieta935habeas.wpd         15

emotion or sympathy, emotional insensitivity, indifference to the feelings or suffering of others." *Id*. (emphasis in original). "Therefore, to demonstrate 'an exceptionally callous disregard for human suffering' . . . the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of second degree murder." *In re Scott*, 119 Cal.App.4th 871, 891 (2004) (citations omitted).

While the shooting was unquestionably violent, as most murders are, the circumstances of petitioner's offense discussed in detail above simply do not support a finding that the crime was committed in a "more aggravated or violent manner" than other second degree murders, and review of the record reveals no evidence that petitioner's commitment offense was carried out with the type of gratuitous violence, torture or disregard for the victim that would permit it to be defined as "especially cruel and callous" as that term has been defined by the courts. In addition, the Board's finding that the motive was trivial is not supported by the record. Petitioner's motive in going back to the place where he had an argument with Alvir was to rescue his friend who was left behind in the territory of a rival gang. Petitioner has been attacked by Alvir earlier in the day; thus, he had a reason to believe that Alvir was dangerous and would attack him again if he saw that petitioner came back to the neighborhood. Petitioner claimed that he meant to frighten Alvir and did not mean to kill anyone. The Board did not say that it disbelieved petitioner's version of events. That the Board did not think the crime was justified does not mean that the motive was trivial. Every murder without an affirmative defense is unjustified as a matter of law.

Furthermore, given petitioner's rehabilitation by education and conduct while imprisoned and the Board's favorable view of petitioner's application for release in 2004, petitioner's commitment offense, which occurred nineteen years before the hearing, cannot demonstrate that petitioner's release will pose an imminent danger to public safety. *See Biggs*, 334 F.3d at 917; *see also Dannenberg*, 34 Cal.4th at 1094 ("sole reliance on the commitment offense might, in particular cases, violate" section 3041(a)'s "provision that a parole date 'shall normally be set' under 'uniform term principles, and might thus also

contravene the inmate's constitutionally protected expectation of parole"). Petitioner is now forty-threes years old. The Board was conducting petitioner's seventh parole suitability hearing. Petitioner had been in prison for more than nineteen years and had an exemplary record of conduct for all of that time. The court finds Board's reliance on petitioner's commitment offense to determine that petitioner posed an unreasonable risk of danger to society is not supported by some evidence.

The Board also cited petitioner's "escalating pattern of criminal conduct" and failure "to profit from society's previous attempts to correct his criminality," as a basis for denying parole. (Resp. Ex. 2 at 80.) The facts which support this finding pertain to petitioner's early criminal record. The Board may consider a prisoner's "past criminal history, including involvement in other criminal misconduct which is reliably documented." 15 Cal. Code Regs. § 2402(b). Petitioner's record consists of one misdemeanor and one felony as a juvenile and one misdemeanor as an adult.

To "escalate" is "to increase in extent, volume, number, amount, intensity, or scope." *See* Merriam-Webster Online Dictionary, retrieved June 18, 2009, from http://www.merriam-webster.com/dictionary/escalate. A record consisting of two misdemeanors and a single felony, particularly with the felony taking place in 1982, and two misdemeanors in 1983 and 1984, does not fit neatly within the definition of escalation. Further, while the record may support a conclusion that petitioner previously failed to profit from society's attempts at rehabilitation, the Board's finding is based on facts that will never change. This court must determine whether the Board's finding would support a finding of *present* unsuitability. As the Board noted, petitioner's record in prison was unblemished. Over the time of his incarceration, petitioner has shown that he is willing and able to take the steps necessary to profit from the rehabilitative programs available to him while incarcerated and to take those skills into society if released. Thus, the court finds that the Board's reliance on petitioner's prior criminal history to determine that petitioner posed an unreasonable risk of danger to society is not supported by some evidence.

"[R]elease on parole is the rule, rather than the exception." *In re Smith*, 114 Cal.App.4th at 351. "[A] grant of parole is an integral part of the penological system intended to help those convicted of crime to integrate into society as constructive individuals as soon as possible and alleviate the cost of maintaining them in custodial facilities." *People v. Vickers*, 8 Cal.3d 451, 458 (1972); *see also Morrissey v. Brewer*, 408 U.S. 471, 477 (1972). If he will pose no unreasonable risk to public safety, petitioner is entitled to be paroled and in fact is well beyond the point at which he became entitled to have a parole date set. Cal. Pen. Code, § 3041, subd. (a). The routine repetition year after year in the face of overwhelming evidence to the contrary that an inmate is considered too dangerous for parole because he committed a violent crime does not satisfy the mandates of due process. In light of petitioner's entire record, the court finds that state court's decision affirming the Board's denial constituted an objectively unreasonable application of *Hill*'s "some evidence" standard. Accordingly, petitioner's due process claim is GRANTED.[5]

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is GRANTED. The Board shall find petitioner suitable for parole at a hearing to be held within **thirty (30) days** of the finality of this decision, unless new evidence of his conduct in prison or change in mental status subsequent to the September 29, 2005 parole consideration hearing is introduced that is sufficient to support a finding that petitioner currently poses an unreasonable risk of danger to society if released on parole; and in the absence of any such new evidence showing petitioner's unsuitability for parole, the Board shall calculate a prison term and release date for petitioner in accordance with California law. Further, if the release date already has passed, respondent shall, within **ten (10) days** of the Board's hearing, release petitioner from custody. With respect to his presumptive period of parole, petitioner is to be credited for any time that has lapsed since the release date calculated by

---

[5] Petitioner also raises three alternative grounds for habeas relief. Because petitioner is entitled to relief based on his first claim, it is unnecessary to address these grounds.

1  the Board or January 27, 2006 (when a finding of suitability at the September 29, 2005
2  parole consideration hearing would have become final pursuant to Cal. Penal Code §§
3  3041(b) and 3041.2(a)), whichever is later.  The court retains jurisdiction to review
4  compliance with its order.

5      IT IS SO ORDERED.

6  DATED:  10/13/09

RONALD M. WHYTE
United States District Judge